# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE PLX TECHNOLOGY INC. | ) | Consolidated C.A. No. 9880-VCL |
| STOCKHOLDERS LITIGATION | ) | |

## MEMORANDUM OPINION

Date Submitted: March 31, 2022
Date Decided: April 18, 2022

R. Bruce McNew, COOCH AND TAYLOR, P.A., Wilmington, Delaware; Randall J. Baron, David A. Knotts, ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; Kent Bronson, MILBERG TADLER PHILLIPS GROSSMAN LLP, New York, New York; *Attorneys for Plaintiffs*.

Kevin G. Abrams, J. Peter Shindel, Jr., Matthew L. Miller, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Richard D. Heins, ASHBY & GEDDES, Wilmington, Delaware; Patricia L. Enerio, Melissa N. Donimirski, Jamie L. Brown, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; Michael A. Weidinger, Elizabeth Wilburn Joyce, PINCKNEY, WEIDINGER, URBAN & JOYCE, Greenville, Delaware; Lori Marks-Esterman, Renee M. Zaytsev, OLSHAN FROME WOLOSKY LLP, New York, New York; *Attorneys for Defendants.*

**LASTER, V.C.**

In 2016, the court approved a settlement between a class of stockholders of PLX Technology, Inc. ("PLX") and all but one of the defendants. The settlement resolved challenges to the acquisition of PLX by merger in 2014 (the "Merger"). The settlement called for a settlement administrator (the "Administrator") to distribute the settlement proceeds on a pro rata basis to all holders of record of shares of PLX common stock at the effective time of the Merger, except for the defendants and their affiliates (the "Excluded Holders").

In an attempt to reduce administrative costs and avoid a complex notice-and-claim process, plaintiffs' counsel ("Class Counsel") and the Administrator sought to distribute the settlement proceeds through the Depository Trust Company ("DTC"). It turns out that DTC has adopted a policy against distributing settlement proceeds to a DTC participant that held shares on behalf of an Excluded Holder unless it has received a "Payment Suppression Letter" from the DTC participant. In the Payment Suppression Letter, the DTC participant instructs DTC to exclude the settlement consideration associated with the Excluded Holder and undertakes to indemnify DTC against any claims arising from the distribution.

An impasse has arisen because almost all of the DTC participants who held shares for Excluded Holders have failed to provide Payment Suppression Letters. Some DTC participants have simply refused. Others have studiously ignored persistent inquiries from the Administrator and Class Counsel.

Currently, the Administrator is in the untenable position of being required to distribute the settlement proceeds to record holders and not to Excluded Holders, yet the

Administrator cannot accomplish this task because of its inability to obtain Payment Suppression Letters and DTC's refusal to proceed without the letters. The process of settlement administration has ground to a halt.

To break the impasse, Class Counsel has moved for an order modifying the plan of distribution (the "Motion"). The order approving the modified plan will authorize and direct the Administrator to obtain information from DTC about PLX's record holders and Excluded Holders on the date of the Merger. The Administrator then will distribute the settlement proceeds directly to the DTC participants, bypassing DTC and obviating the need for the Payment Suppression Letters.

The request is unopposed, and this decision approves it. The court has issued this decision largely as a public service announcement. Corporate litigators need to be familiar with the bug in this particular settlement technology and understand the fix. Even with the workaround, the method of distributing settlement proceeds to record holders remains more efficient than the traditional notice-and-claim process.

In addition, Class Counsel deserves credit for their assiduousness in working through these challenges. Class Counsel received an award of fees and expenses based on the benefits they conferred in the litigation. That award did not take into account the subsequent burdens associated with a lengthy period of settlement administration. Class Counsel also did not have a client pushing them to figure out the answers. As a judge who has bluntly criticized class action lawyers when they have succumbed to agency costs or

otherwise fallen short,[1] I think it important to acknowledge when members of the class action bar have made a special effort to fulfill their obligations.

## I. FACTUAL BACKGROUND

The facts are drawn from the Motion and its supporting documents. Other facts are drawn from earlier docket items in the case or are matters suitable for judicial notice.

### A. The Settlement

In 2014, Class Counsel filed a complaint alleging that the directors of PLX breached their fiduciary duties in connection with the Merger, a transaction in which Avago Technologies Wireless (U.S.A.) Manufacturing Inc. ("Avago") used an acquisition subsidiary to acquire PLX. The complaint asserted that Avago, its acquisition subsidiary, and Potomac Capital Partners II ("Potomac") aided and abetted the directors in breaching their fiduciary duties. Class Counsel subsequently amended the complaint to assert that Deutsche Bank, PLX's financial advisor in connection with the Merger, aided and abetted the directors in breaching their fiduciary duties.

The defendants moved to dismiss the amended complaint under Rule 12(b)(6). The court granted the motion in part, dismissing the claims against Avago, its acquisition subsidiary, and two of the director defendants.

On August 17, 2016, Class Counsel settled with all of the defendants except for Potomac. Dkt. 159 (the "Settlement"). The litigation proceeded through trial against

---

[1] *See, e.g.*, *In re Revlon, Inc. S'holders Litig.*, 990 A.2d 940 (Del. Ch. 2010).

Potomac. *See In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535 (Del. Ch. Oct. 16, 2018), *aff'd*, 211 A.3d 137 (Del. 2019) (TABLE). In its post-trial decision, the court found that Potomac had aided and abetted a breach of fiduciary duty by the PLX directors, but that the Class Counsel had failed to prove damages.

The Settlement defined the "Class" as a

non-opt-out class consisting of all record and beneficial holders of PLX common stock who held such stock at any time between and including June 23, 2014 and August 12, 2014, including any and all of their respective successors-in-interest, successors, predecessors-in-interest, predecessors, representatives, trustees, executors, administrators, estates, heirs, assigns and transferees, immediate and remote, and any Person acting for or on behalf of, or claiming under, any of them, and each of them, together with their predecessors-in-interest, predecessors, successors-in-interest, successors, and assigns, but excluding the Settling Defendants, Non-Settling Defendants, Avago, and [Avago's acquisition vehicle], their respective affiliates as to their own accounts (i.e., accounts in which they hold a proprietary interest), and any person, firm, trust, corporation, or other entity affiliated with Avago, [Avago's acquisition vehicle], or any Settling or Non-Settling Defendant.

Settlement ¶ 1(b) (the "Class Definition"). The Class Definition thus excluded the Excluded Holders, which is a standard approach.

The Settlement consideration consisted of $14,125,000 in cash. *Id.* ¶ 1(s) (the "Common Fund"). The Settlement provided for Class Counsel to retain a settlement administrator to administer and distribute the Common Fund. *Id.* ¶ 2(d). Galardi & Co. LLC has served as the Administrator.

After deducting the award of attorneys' fees and expenses to Class Counsel, and after paying the Administrator's costs and expenses, the Settlement called for the Administrator to distribute the amounts remaining in the Common Fund

4

on a pro rata basis to all holders of record of shares of PLX common stock as of the date the Merger closed, except no such payment shall be made to any Person excluded from the Class, except as permitted in Paragraph 1(b).

*Id.* (the "Plan of Distribution"); *see id.* ¶ 21 (providing that any awarded attorneys' fees and expenses would come "solely from the Common Fund," and that the amount paid to create the Common Fund "shall be wholly inclusive of all fees, expenses, cost disbursements, and expert and consulting fees associated with the creation of the Common Fund").

To facilitate the Plan of Distribution, the Settlement required PLX to provide the Administrator with the following information, to the extent available:

(i) a list of the holders of record of PLX common stock as of the closing of the Merger containing each holder's name, address, and the number of shares owned and (ii) similar lists or reports available from PLX's Transfer Agent or the [DTC] identifying the beneficial owners of PLX common stock as of the Merger Date, as appropriate for providing notice of the Partial Settlement to the Class.

*Id.* ¶ 2(f).

On December 20, 2016, the court approved the Settlement. Dkt. 204.

**B.      Problems With Implementation**

To implement the settlement, Class Counsel and the Administrator attempted to follow the method approved by this court in *In re Dole Food Company, Inc. Stockholder Litigation*, 2017 WL 624843 (Del. Ch. Feb. 15, 2017). In *Dole*, the court initially approved a settlement that called for settlement proceeds to be distributed to class members through a traditional notice-and-claims process. The class consisted of holders of 36,793,758 shares. But due to various factors relating to the time allowed for clearing trades, as well

5

as the existence of a significant short interest when the merger closed, claimants submitted facially eligible claims covering 49,164,415 shares. *See id.* at *3–4. The court found that it was "functionally impossible to resolve the share discrepancy in a practical or cost-effective manner. The resulting process would be lengthy, arduous, cumbersome, expensive, and fundamentally uncertain." *Id.* at *4.

As a workaround, class counsel proposed modifying the settlement "to replace the claims process with a *pro rata* distribution through DTC." *Id.* Under that model, members of the class who held their shares in street name as beneficial owners would receive the settlement proceeds in the same manner that they received the merger consideration. The administrator would pay the consideration to Cede & Co., the nominee for DTC and the record holder appearing on PLX's stock ledger. Cede would then distribute the consideration to DTC and the custodial banks and brokers who are DTC participants. From there, the proceeds would flow on, moving through the network of Article 8 entitlement holders until eventually reaching the ultimate beneficial owners.

Using this method meant that "it will be up to the DTC participants and their client institutions to resolve in the first instances any issues over who should receive the settlement consideration." *Id.* at *6. The court explained that

> [s]hifting the burden to them is efficient because they already had to address these issues for purposes of allocating the merger consideration. If new issues arise, the DTC participants and their client institutions have access to their own records, and they have visibility into the terms of their contractual relationships, such as the terms on which shares are borrowed. Any ensuing disputes are between the beneficial owners and their custodial banks and brokers. Those disputes should be resolved pursuant to the contractual mechanisms in the governing agreements or, if necessary, through a judicial proceeding limited to the parties. Addressing those disputes is not part of the

6

settlement process and therefore not a task for [the settlement administrator] or this court.

*Id.* (citation omitted).

The court observed that distributing the consideration through DTC created potential problems of its own. For example, "under this method, consideration could flow to holders of shares that are excluded from the class under the terms of the settlement, such as shares for which appraisal was sought or those held by certain defendants." *Id.* at *7. Class counsel reported, however, that DTC could "tailor the distribution to bypass the excluded holders if provided with the names of the account holders, the account numbers, the custodial banks or brokers, and the number of shares held in each account." *Id.* To enable DTC to tailor the distribution, the court directed the parties in *Dole* to "provide this information to DTC to the extent the information is within their possession, custody, or control." *Id.*

The *Dole* court observed that there was nothing unique about the problems that infected the settlement. "The only difference was the magnitude of the discrepancy, which made the issues visible." *Id.* at *7. The court concluded that "[d]istributing the settlement consideration in merger cases to record holders from the outset would mitigate both pathologies and reduce overall administrative expenses, which in turn will benefit the class." *Id.*

The parties in this case heeded the guidance from the *Dole* decision and sought to proceed from the outset by distributing the settlement proceeds to record holders through DTC. But since the *Dole* settlement, DTC has imposed additional requirements. Now, DTC

7

also requires a Payment Suppression Letter from each DTC participant that held shares on behalf of an Excluded Holder. In the Payment Suppression Letter, the DTC participant confirms that DTC can withhold payment for the excluded shares, and the DTC participant agrees to indemnify DTC against any claims arising from the withholding of that payment.

Presumably, a well-meaning lawyer for DTC dreamed up the Payment Suppression Letter as a way to build in additional protections for DTC in the event that DTC's reliance on a court order was deemed insufficient to insulate DTC from liability in some form of litigation brought against DTC as a result of the settlement distribution. Unfortunately, introducing the Payment Suppression Letter not only adds another step to the process, but the additional step requires a deliverable from a party outside the court's control, who can readily ignore the request. Moreover, the Payment Suppression Letter requires that the DTC participant undertake an obligation to indemnify DTC, which the DTC participant understandably might resist.[2]

In this case, the defendants and PLX have already provided DTC with the *Dole* information, *viz.* the names of the account holders associated with Excluded Holders, the

---

[2] I make this observation without any meaningful insight into whether or the degree to which the request for indemnification actually alters the existing internal governance relationship between DTC and its participants and their respective obligations. It would not be surprising to find out that there are already detailed internal governance agreements between the parties that contemplate indemnification, exculpation, waivers of rights and obligations, and numerous other features. The fact that DTC asked for indemnification in the Payment Suppression Letter nevertheless implies that DTC thought it was getting something additional, and a DTC participant might well reject the request on that basis. After all, what was the DTC participant receiving in return other than the opportunity to pass on the consideration its own entitlement holders?

custodial banks or brokers, and the number of shares held in each account. The impediment is the need for Payment Suppression Letters. The custodial banks or brokers have either declined to provide them, or they have failed to respond to the Administrator and Class Counsel. DTC therefore has not received the Payment Suppression Letters that it requires, and the process for distributing the Common Fund has seized up.

Class Counsel conferred with DTC and the Administrator regarding potential solutions, and they developed a workaround. To implement it, Class Counsel filed the Motion. Dkt. 409.

In the Motion, Class Counsel asks the court to approve a modified plan of distribution (the "Modified Plan"). The order approving the Modified Plan would empower and instruct the Administrator to obtain from DTC:

> (1) an allocation report used by DTC to distribute the Merger consideration,
>
> (2) any additional information necessary to identify all DTC participants who received the merger consideration in exchange for their shares of PLX common stock,
>
> (3) the number of shares as to which each DTC participant received payment or the amount of consideration each DTC participant received, and
>
> (4) the correct address or other contact information used to communicate with the appropriate representatives of each DTC participant that received Merger consideration.

*Id.*, Proposed Order ¶ 1 (the "Additional Information"). The Modified Plan would authorize the Administrator, rather than DTC, to use the Additional Information to send payments directly to the DTC participants. By relieving DTC of the responsibility for distributing the

9

proceeds, this solution avoids the need to obtain Payment Suppression Letters and should enable the Administrator to distribute the proceeds promptly.

## II.     LEGAL ANALYSIS

A distribution plan "must be fair, reasonable, and adequate." *Schultz v. Ginsburg*, 965 A.2d 661, 667 (Del. 2009), *overruled on other grounds by Urdan v. WR Cap. P'rs, LLC*, 244 A.3d 668, 678 (Del. 2020). Where a movant seeks to modify a settlement to alter the plan of distribution, the court treats it as a "request to modify the plan of [distribution] for good cause shown." *Dole*, 2017 WL 624843, at \*4. When considering the reasonableness of a plan of distribution, the court can "take into account the administrative difficulties involved in achieving a proposed plan of allocation, including the anticipated expenses." *Id.*

The Modified Plan is fair, reasonable, and adequate, and good cause exists to adopt it. As noted, the Administrator is currently unable to distribute the settlement proceeds to record holders through DTC because of the inability to obtain the Payment Suppression Letters. The current Plan of Distribution has gotten stuck.

The court's ability to address this particular logjam is limited. DTC is not a party to this proceeding, and the court has no power to order DTC to modify its approach. The DTC participants who have failed to provide Payment Suppression Letters also are not parties to this proceeding, and the court can neither order them to respond, nor direct them to provide the Payment Suppression Letters.

Under the Modified Plan, the Administrator will be instructed and empowered to obtain the Additional Information from DTC. Class Counsel has indicated that DTC is

willing to provide the Additional Information if the court enters the proposed form of order. There are potential means by which Class Counsel might be able to use the judicial process to secure information from DTC, but hopefully it will not be necessary to explore those avenues. The court expresses its appreciation to DTC for having worked with Class Counsel in an effort to move the settlement forward.

With the Additional Information, the Administrator will distribute to each DTC participant its pro rata share of the Common Fund, less its share of the proceeds associated with shares held by an Excluded Holder through that DTC participant. The Administrator will send instructions to each DTC participant to withhold payments from the Excluded Holders. As in *Dole*, however, it will be up to each DTC participant to distribute its share of the settlement consideration to its entitlement holders, and any disputes about whether the DTC participant distributed the settlement consideration properly will be "between the beneficial owners and their custodial banks and brokers." *Dole*, 2017 WL 624843, at *6. "Addressing those disputes is not part of the settlement process and therefore not a task for [the Administrator] or this court." *Id.* The Modified Plan appropriately places the "risks inherent in choosing to hold in street name" on the "beneficial owner who made that choice," including the risks that "[a] custodial bank or broker could err in processing the settlement consideration and the beneficial owner might not find out" or that "a beneficial owner might have to sue its custodial bank or broker" to correct the issue. *Id.* at *6.

To assist beneficial owners in overseeing the distribution process, the Administrator shall update the settlement website,[3] promptly after making the distribution, to reflect the date and per-share amount. That information will enable members of the Class to make inquiries if they do not receive the settlement proceeds that they expect.

### III. CONCLUSION

The Modified Plan is fair, reasonable, and adequate. The Motion is granted.

---

[3] http://www.plxsecuritieslitigation.com.